UNION LIFE INSURANCE COMPANY OF OMAHA V. WILHELM HAMAN, GUARDIAN.

FILED APRIL 21, 1898.   No. 7832.

1. **Conflicting Evidence:** REVIEW. A verdict on conflicting evidence will not be disturbed unless manifestly wrong.

2. **Action Against Insurance Company:** VERDICT FOR PLAINTIFF. The evidence examined, and *held* that there was sufficient thereof in support of the verdict returned.

3. **Rulings on Evidence:** REVIEW. Actions of the trial court in the admission of alleged objectionable evidence considered and determined not erroneous.

4. **Insurance:** PAYMENT OF PREMIUM: CREDIT: QUESTION FOR JURY. To constitute a life insurance policy operative and of force it was necessary that the first premium should be paid, and in an action on the policy there was evidence sufficient to sustain a finding that the general manager of the company had extended credit to the party named in the policy for the payment of the first premium. *Held*, That the question of whether such credit had been given was a proper one to submit to the jury; and further, that such question was within the issues presented by the pleadings in the case at bar.

5. ———: ———. *If, for the payment of such first premium, a credit was extended, the policy became of effect and binding.*

6. ———: STATEMENTS OF AGENT: EVIDENCE. The statements of an agent while acting in a matter in which he has authority, and of matters within the scope of his authority, and of and concerning the business in hand, made at the immediate time of its transaction, or a part thereof, are admissible in evidence against his principal.

7. ——: ——: ——. Such statements made subsequent to the close
of the transaction, not connected therewith and not specially au-
thorized by the principal, cannot be received in evidence against
the latter.

8. ——: INSTRUCTIONS: REVIEW. Actions of a trial court in giving
portions of the charge to the jury approved or *held* not prejudi-
cially erroneous.

9. Harmless Error. Errors which it is clear from an inspection of the
whole record did not prejudice the rights of the complaining party
furnish no sufficient cause for reversal of a judgment.

ERROR from the district court of Douglas county.
Tried below before KEYSOR, J. *Affirmed.*

*W. W. Morsman,* for plaintiff in error.

*Brome, Burnett & Jones.* contra.

HARRISON, C. J.

Of date December 16, 1891, there was executed an in-
strument, in form a policy of insurance on the life of
John W. Drewlow, in the sum of $2,000, the beneficiaries
therein named being Helen and Richard Drewlow, the
children of John W. Drewlow, and of date August 8,
1893, this action was instituted in the district court of
Douglas county by the defendant in error as guardian
of Helen and Richard Drewlow, it being alleged in the
petition that the policy of insurance was, of the date
we have before stated, issued and delivered to the as-
sured; that he "kept and performed all the conditions
and agreements on his part to be kept and performed,
and paid the consideration in said agreement mentioned
at the time the same was due and payable, excepting
the sum of $62.80 falling due on the 16th day of Decem-
ber, 1892, and said sum was on said date duly tendered
and offered to defendant by said Drewlow." The death
of John W. Drewlow of date March 24, 1893, the furnish-
ing to the company of proof thereof, demand of payment
of the amount of the insurance, and failure and refusal
by the company were pleaded. In the answer there

was a denial that the company ever delivered or authorized the delivery of the agreement or policy in suit, and it was stated that the policy was signed pursuant to an application by John W. Drewlow to the company for the issuance with the express understanding that it was not to take effect until the amount of the first premium should be paid in full, and that the first premium had never been paid and the policy had never been of force or effect. The further portions of the answer were as follows: "That the agreement or policy of insurance sued on, copy of which is set out in the petition, was obtained by the said John W. Drewlow, during his lifetime, by fraud; that prior to, and on the 16th day of December, A. D. 1891, Frank H. Chapman was a soliciting agent in the employ of this defendant; that said Frank H. Chapman employed the said John W. Drewlow to assist him in securing applications for insurance to be taken by this defendant, and in order to enable the said John W. Drewlow to show and represent to persons whom he might solicit to make applications for insurance that he (said Drewlow) had himself taken a policy on his own life, the said Chapman and Drewlow made out an application in writing in the name of said Drewlow, as applicant, for the policy of insurance sued on, and procured a medical examination of said Drewlow, and forwarded the said application to this defendant; that this defendant accepted said application and issued the policy of insurance sued on, and, together with a receipt duly signed, for the first premium, to-wit, the sum of $62.80, forwarded the same to said Chapman, to be delivered to the said Drewlow upon the payment of said $62.80, and not otherwise; that in fact the said Drewlow did not make said application in good faith and did not intend to accept the said policy of insurance and pay the premium aforesaid, or any premium thereon, of all of which this defendant was wholly ignorant and issued the said policy and forwarded the receipt aforesaid in good faith believing the said application to have been made *bona fide*,

and would not have issued the same if it had known the facts aforesaid; that afterwards the said Chapman, the said John W. Drewlow then being present and consenting, at the office of this defendant, in Omaha, Nebraska, surrendered to this defendant the aforesaid receipt for the first premium, stating that the said Drewlow did not intend to accept the said policy of insurance or pay the said premium or any premium thereon, which receipt this defendant then accepted and destroyed and demanded the return of said policy of insurance, which the said Chapman and said Drewlow then promised, but afterward failed to do; that afterwards the said John W. Drewlow, being about to undergo a painful surgical operation, represented to the said Chapman that he (Drewlow) would be compelled to submit himself to the influence of chloroform, and that he feared he might not survive the same, and desired to obtain the benefit of said policy of insurance for his children in the event of his death during such operation; and thereupon it was agreed by and between the said Chapman and said Drewlow that the said Drewlow should execute in favor of said Chapman his (Drewlow's) promissory note for the amount of the first premium aforesaid, and date the same back to a period within sixty days from the date of said policy of insurance, and that said Chapman should execute a receipt for the amount of said first premium and place the same in the hands of one Underberg during the surgical operation, and that if the said Drewlow should survive the said operation such note and receipt be destroyed, but in the event of his death during the same the note would be paid by a relative of said Drewlow and the receipt delivered showing the payment of said premium, all of which the said Chapman and Drewlow then did and performed, but wholly without the knowledge or consent of this defendant and in fraud of this defendant's rights; that said Drewlow in fact survived said operation, but whether said note and receipt were destroyed or not this defendant has no knowledge or

information; but this defendant says the said Drewlow did not pay or intend to pay the said note or said premium, or any part of the same; that the said Chapman had no authority to accept a note in payment of said first premium, nor any authority to execute a receipt for the same or to receive payment of said premium, except upon the production of a receipt therefor signed by the president, or the vice-president, or the secretary of this defendant, all of which the said Drewlow then well knew." The reply was a general denial. The guardian was successful in the district court and the company presents the cause here for review.

We deem it best to first discuss and determine the question of the sufficiency of the evidence to sustain the verdict. It is urged that the verdict has no support in, and is contrary to, the evidence, and in this connection, also, that the trial court erred in refusing a request to direct a verdict for the company.

One F. H. Chapman was called as a witness and testified that during the winter season of 1891 he was agent or solicitor for the company at Stanton, this state, where Drewlow then lived, and that he, Chapman, employed Drewlow to assist in soliciting parties to take insurance, and further testified substantially as follows: "I took an application from him for a policy of insurance, and forwarded it to the company. I had solicited him for life insurance, and he claimed he could not afford to carry it, so I told him that I would get him a policy any way, and I did so. It was not the understanding that he was to pay for the policy. I told him it would not be necessary; I would get him a policy without, and I did so. Drewlow spoke the German language, and I was among Germans and he was assisting me, and the question arose often why he did not carry a policy, and I thought I would fix that by getting him a policy, and I did so. The policy was not to be delivered at all. He was not to pay anything for it. He did not pay anything for it. I received the policy within a day or two after its date,

together with a receipt for the first premium, somewhere along about $60. I afterward returned this receipt to Mr. Harrison on Christmas day, 1891. Mr. Drewlow and myself were present together in the office of the defendant at Omaha. Mr. Hunter was also present, and, I think, all of them. I told them that he [Drewlow] was not going to take the policy; that he had got the policy for soliciting purposes, and I returned the receipt so it would not be charged against me. This was in the presence of Drewlow, and he made no protest or objection. Then I went out with Mr. Wigton to the bank to get a check cashed, and when I returned Mr. Hunter and Mr. Drewlow had had some talk, and Mr. Hunter didn't like the plan, and he told me that Mr. Drewlow had concluded to take the policy. Mr. Hunter said the policy should be returned if it was not taken. Drewlow did not take it, or pay any premium on it. Afterwards, Drewlow submitted to a surgical operation. This was in the spring after the policy was issued. When he was ready for the operation he came to me and wanted me to arrange to make the policy good. I didn't like to do it, but I did. I gave him a receipt for the first premium. He gave me a note for the amount. We dated the receipt and the note back. He told me that his brother-in-law would pay the note in case he died during the operation. These papers were given to Dr. Underburg, and after the operation they were to be returned to him, if he didn't die. He survived the operation. I do not know what became of the papers. I never saw them afterwards, and never thought he would claim the policy was in force and I neglected to call for the receipt. He never paid the note to me. The receipt and note were dated back, so as to make it appear that the transaction occurred within sixty days from the date of the policy, and avoid the rule of the company, which would have required a re-examination. This letter now shown, to be marked 'Exhibit 2,' is in the handwriting of Mr. Drewlow. I received it by mail, along in the summer after the surgical operation.

I first informed the company of the fact that this policy was applied for without any expectation on the part of Drewlow of paying the premium, and for the purpose of using it merely to aid in soliciting insurance, on Christmas day, 1891. I did not inform the company of the arrangement entered into between Drewlow and myself at the time of the surgical operation, until after the money was offered for the second premium. My arrangement with Drewlow was, that I gave him a percentage on the business done, to be paid out of my own commission. The paper marked 'Exhibit 3' is signed by me. It is the same paper that I gave at the time that Drewlow was about to submit to the surgical operation. I said nothing to the defendant about the matter until the time when Mr. Wigton came to Hastings to see me about it, some time in the following summer, I think. It was at the same time that Mr. Wigton came to see me, and Mr. Hunter went to Stanton to look the matter up."

On cross-examination his testimony was in part as follows:

Q. At the time you got this policy, what date was it with respect to the date of the policy?

A. Probably one day after, or the same day perhaps. Probably one day later though.

Q. After you got this policy up there did you deliver it to Mr. Drewlow?

A. We officed together.

Q. It is a fact that the policy was turned over to him?

A. Well, yes.

Q. Now, on Christmas day you and Mr. Drewlow came down here to Omaha?

A. Yes, sir.

Q. And at the time this policy came to you, there was a receipt for the first premium that came with it?

A. Yes, sir.

Q. And when you came back down here to Omaha you brought that receipt back?

A. Yes, sir.

Q. And you went in with Mr. Drewlow and had a talk with Mr. Hunter and Mr. Wigton?

A. Yes, sir.

Q. And in which you told them that Mr. Drewlow had concluded not to take this policy?

A. No, I told them that he was not to take the policy; that he said he could not pay for it and he didn't want to take the policy. They urged him at that time to take the policy.

Q. Didn't they say to him—didn't Mr. Hunter say to him at that time that he could take the policy and pay for it out of the premiums he would make from business you and he could obtain?

A. Yes, sir.

Q. And subsequently you went out?

A. Yes, sir.

Q. And when you came back Mr. Hunter told you that Mr. Drewlow had concluded to take the policy?

A. Yes, sir; he said that Drewlow had concluded to take the policy, but the facts of the case were——

Q. Now, did you mean that Hunter said the facts were?

A. No, that was mine.

Q. What else did Mr. Hunter say about that at that time?

A. There was nothing in particular.

Q. Who was Mr. Hunter?

A. Mr. Hunter was the general manager.

Q. How?

A. General manager.

Q. He was general manager of the company?

A. Yes, sir.

Q. And this conversation took place at its home office here in Omaha?

A. Yes, sir.

Q. In Christmas, 1891?

A. Yes, sir.

Q. Mr. Hunter was the man under whose supervision you were acting as agent?

A. Yes, sir.

Q. Now, isn't it a fact that after you went back to Stanton this policy was delivered to Mr. Drewlow?

A. He had possession of it all the time. He had possession of it in this way: we had our office together. Yes, sir; I gave him the policy, and when we solicited insurance he pulled his policy and showed them.

Q. He took the policy along with him when he went with you to solicit insurance?

A. Yes, sir.

Q. And had possession and control of it?

A. Yes, sir.

Q. And Mr. Drewlow assisted you in soliciting insurance during the months of February and March?

A. Well, Drewlow didn't do very much. He worked with me for a while, and saw a good number of people, and then, when I would insure a man, he would come in for his part of the commission; and if I was allowed to say what I started to say a while ago I could explain that a little.

Q. Well, go ahead and let us have the explanation.

A. Mr. Hunter told me at the time that Mr. Drewlow and Hunter and I were talking, and when Mr. Hunter made the remark that he would take the policy, of course he knew nothing of our private matters. Drewlow was not good pay, and I did not want to deliver him the policy. I had no intention of delivering him the policy without he paid for it. He never paid for it.

Q. You simply delivered him the policy and he never paid for it?

A. It had been delivered prior to that.

Q. And after that he assisted you in soliciting insurance?

A. Yes, sir.

Mr. A. L. Wigton, secretary of the company, was present in the office at Omaha when Chapman and Drewlow were there and gave up the receipt, and testified to its being given to the cashier and destroyed, and a record

made in the books that the policy was not taken, and that the two then stated the policy had not been obtained as insurance on the life of Drewlow but as a "decoy policy" to use in soliciting other parties to insure; that the company did not learn or know that Chapman had given Drewlow a receipt showing payment of the first premium or that Drewlow was asserting the policy of force, until November, 1892.

The cashier testified in the main the same as the secretary, and further as follows: "The company first learned in November, 1892, that Drewlow, or some person for him, was claiming that the policy was in force. Mr. O'Halleron came in and asked when a second premium would be due. The first premium was never paid. I keep the books of the company. When this policy was sent out with the receipt for the first premium, the amount of the receipt was charged to the account of Chapman; that was the usual and ordinary way of keeping an agent's account; but it is an agent's account—sort of a memorandum account. Whenever a policy was sent to an agent, it is charged to his account, and he is held responsible for it until the receipt is returned or the money paid."

The witness Chapman was called for the defendant in error on rebuttal and stated as follows:

Q. Mr. Chapman you may state whether or not during the time you have been transacting business for the Union Life Insurance Company it has been customary and usual for you to settle for and collect premiums upon policies solicited by you and issued through you, as agent, in such manner and upon such terms as you saw fit.

A. The company require a certain amount of money from me on each policy. They hold me for that. The settlement I make with the—. The settlement with the parties I make myself.

Q. Has it been customary and usual for you to extend credit to parties for the first premium, if you saw fit?

A. Yes, sir; that is, on the payment of the first premium. I have arranged the payment of it.

Q. You may state whether or not you did that with respect to policies issued while you and Drewlow were acting together at Stanton.

A. Yes, sir.

One Walter Lucas was interrogated on rebuttal in regard to a conversation between Chapman and Drewlow relative to the policy, and whether he had heard it. He stated that he did, and was further asked and answered:

Q. I will ask you whether or not upon that occasion Mr. Drewlow gave a revolver to Chapman and said that makes us square on the premium on my life insurance, and Mr. Chapman answered, Yes, that straightens it up?

A. He did.

Q. Did you hear that conversation?

A. I did, sir.

He also said that he had been in possession of and carrying the revolver for some time prior to the conversation and Drewlow asked him, the witness, for it, saying that it was to be delivered to Chapman to finish the payment for the policy.

George E. Bryson testified that at three or four different dates during the month of January, 1892, Chapman told him, the witness, that Drewlow had paid the first premium on the life insurance policy. These were all at times when Chapman was soliciting the witness to make application for insurance.

From an inspection of all the evidence it is clear that the policy did not become operative and of effect by its delivery to Drewlow to use as a "decoy policy," as some of the witnesses expressed it, or in the soliciting of insurance to induce persons asked to insure to believe that Drewlow was a policy-holder. Neither, if believed in all its statements, could it be drawn from the testimony relative to the delivery of the policy, and a receipt for the first premium to Drewlow by Chapman immediately

43

prior to the time at which the former subjected himself to the surgical operation, that the policy became of force; and the jury would have been fully warranted in finding that the policy never did become of force as a contract of insurance, and of such decision it could not have been said that it was without sufficient of evidence to support it; but on the other hand the inference was but fair that when Chapman and Drewlow were at the office of the company in Omaha, and the company, through its officers, the manager, secretary, and cashier, were informed of the facts, circumstances, and motives attendant upon the obtaining of the issuance of the policy, and acting on such information the regular formal receipt for the first premium was destroyed and the policy was ordered returned to the company, but subsequently, during the interview, after being urged by the manager, Drewlow concluded to take the policy, and the information that this conclusion had been reached was conveyed to Chapman by the manager, coupled with the statement that Drewlow could pay for "it out of the premiums" he would make from business done in soliciting insurance for the company by the two, Chapman and Drewlow, that there then arose a contract by which Drewlow became entitled to pay to Chapman the first premium from commissions made in soliciting insurance; and, when considered in connection with the further testimony that Chapman was authorized or with the knowledge of the company gave credit to parties for the payment of the amount of premiums or settled them in his own way, he paying the company, how the settlement was made between the two men ceased to be important to the company. There was also evidence that the payment was made by Drewlow to Chapman. A receipt was introduced, signed by Chapman, by which such payment was evidenced, and there was the statement of Chapman to Drewlow in the presence of the witness Lucas which tended to prove the fact of payment. Of the testimony of Lucas, also that of the witness Bryson, of admission by Chapman of payment of

the premium by Drewlow, it is insisted that it could not be received to show the fact of such payment, as the statements of Chapman in this relation could not bind the company. The statement in the presence of Lucas was a part of and at the immediate time of the transaction and hence was receivable. (1 Am. & Eng. Ency. Law [2d ed.] 691-694; *McCormick v. Demary,* 10 Neb. 515.) The statements to Bryson were not of the time of the transaction and not competent as evidence of the fact in issue. (1 Am. & Eng. Ency. Law [2d ed.] 695; *Gale Sulky Harrow Co. v. Laughlin,* 31 Neb. 103; *Commercial Nat. Bank v. Brill,* 37 Neb. 626.) If the latter was receivable for any purpose, it could but be to affect the credibility of the witness to show statements of the witness at variance with his testimony. That the statements of Chapman disclosed by the former, the testimony of Lucas, could not be received to bind the company could only be true if the further contention was correct, that Chapman was not authorized to receive payment of the first premium; but whether he was so empowered was a question of fact, and we must presume that the jury believed he was, as such a finding was of necessity elemental of the verdict it returned. That Chapman stated the policy to be in force, and the premium paid, was explainable, as is insisted by counsel, on the theory that such statements were made as a part of the scheme to use the policy as a "decoy" to represent it of force, when in reality it was not so; but this and all these matters were of fact for the jury to determine, and its settlement of them, as evidenced by the verdict, had sufficient favorable evidence to sustain it. One of the strongest circumstances lending support to the view of the affair taken by the jury is that, after the officers of the company knew all the facts in regard to the obtaining this policy, and had taken steps to recall it, after the close of the visit of Chapman and Drewlow to Omaha, nothing further was done relative to getting possession of the policy, but it was left with the two men, presumably pursuant to the

talk with the manager of the company. It follows that the argument of the lack of evidence to warrant the verdict and that the decision of the jury was contrary to the evidence is unavailing.

It is argued that the trial court erred in admitting in evidence the insurance policy, on which the suit was predicated, when offered. The ground of the objection and basis of the argument is that at the time it had not been shown that the premium had been paid, or that there was no evidence that it had ever become operative as a contract. That the policy, in the form in which it was offered, had been signed and sent to its agent for delivery was of the facts admitted by the pleadings. This being true as to the policy in suit, it was admissible without further proof; that the first or any premium had not been paid was of the matters placed in issue by the pleadings, and the burden of its proof was on the company.

It was assigned for error that the court overruled the objection on the part of the company to the introduction of the receipt by Chapman to Drewlow for the amount of the first premium. With the view we have taken of the authority of Chapman to settle with Drewlow for this amount, this piece of evidence was entirely competent and receivable, and the same may be said of the third assignment of error, which was in relation to a portion of the testimony of the witness Lucas in which he was allowed to detail the receipt of certain property by Chapman from Drewlow as payment of the balance of the first premium.

During the argument of the cause to the jury the following was made of record: "And both parties having rested, the case was argued to the jury by counsel for each party, whereupon, during the closing argument made by H. C. Brome, Esq., in behalf of the plaintiff, the said H. C. Brome commented upon the testimony on the trial by the witnesses Walter Lucas and George E. Bryson, and argued to the jury that the testimony of said witnesses showed that the first premium on the policy had been

paid in February or January, A. D. 1892; whereupon counsel for the defendant interrupted the argument and objected to the same, on the ground that the evidence of said witnesses had been admitted solely for the purpose of impeaching the credibility of the witness Frank Chapman, and was not admissible for any other purpose, and that counsel for plaintiff had no right to use the same, or comment upon the same, as tending to prove the fact that said premium had been paid; and thereupon the court ruled and stated in the presence of the jury, that while the testimony of said witnesses had been introduced for impeaching purposes only, their evidence tended to contradict the testimony of the said Frank Chapman, to the effect that the first premium on said policy had not been paid, and that it was for the jury to determine from this conflicting evidence, and such other evidence as there might be, whether or not the first premium on said policy had, in fact, been paid; to which ruling and statement of the court so made in the presence of the jury counsel for the defendant then and there excepted, and thereupon the said H. C. Brome, counsel for the plaintiff, proceeded with the argument to the jury, and continued to argue from the evidence of the said witnesses Walter Lucas and George E. Bryson that the testimony of the said witness Frank Chapman, to the effect that the said first premium had not been paid, had been overcome, and that the same was false, and that the said first premium had been thereby shown to have been paid." In the charge to the jury the court made the following statement: "You are instructed that the testimony of the alleged admissions of the witness Chapman, that said policy had been paid for, were not admitted for the purpose of binding the defendant company, and were not competent for that purpose, but were admitted solely as impeaching testimony, and the jury should consider it only so far as it bears on the truthfulness of said witness' testimony that said policy was not paid for." It is contended that the trial court erred in its statement

relative to the testimony made at the time of objection to counsel's argument to the jury by giving to the testimony substantive force as applied to one of the facts in issue; also that it was error to instruct the jury that in considering the effect of this testimony on the credibility of the witness, its application must be narrowed to the truthfulness of one statement, viz., "that the premium had not been paid;" that instead of this the jury should have been informed that the testimony of the conflicting statements should be considered as affecting the credibility of the witness generally and not in regard to any particular fact. The record discloses that the testimony here drawn in question was ostensibly received for but one purpose—that of affecting the credibility of the witness Chapman. The court, during the argument to the jury, evidently concluded it possessed greater significance, and so stated. In the instruction the court gave expression to a contrary view to that it had voiced during the argument. As we have hereinbefore stated, the testimony of Lucas was competent as tending to prove the fact of payment of the premium, and there was other competent evidence of the same import amply sufficient, all taken in connection, to sustain a finding that such payment was made; furthermore, it was not entirely essential that there be such finding as a basis for the verdict returned. The verdict may have been predicated on a determination that an extension of credit had been given for the payment of the premium; and if so, it rested on a supporting foundation in both the evidence and the rule of law applicable and governing. There were errors in these portions of the proceedings, but after a thorough review of the whole we cannot conclude or believe any prejudice to the rights of plaintiff in error resulted therefrom.

It is of the errors assigned and argued that the third paragraph of the charge to the jury was improper, in that it submitted to that body the query of whether Drewlow, during life and good health, paid the first premium to Chapman, the company's agent. This question

was directly of the issues presented and on which the evidence was conflicting, and was for the consideration and determination of the jury; hence it was not error to give the portion of the charge, the subject of this objection.

It is argued that the court erred in giving in its charge to the jury the paragraphs numbered "4" and "5." These are in the following terms:

"4. The defendant has alleged that said policy was obtained from it by fraud. Fraud is never presumed, but must be proved by a preponderance of all the evidence by the party claiming the existence thereof. If you believe from the evidence that said policy was obtained in the first instance under an agreement entered into by said Drewlow and Chapman that said policy should not be paid for and should be used by Drewlow solely for the purpose of showing it and soliciting risks for said company, and that defendant was ignorant of said facts, then you are instructed that such conduct on the part of said Drewlow constituted a fraud sufficient to render the policy void; and said policy could thereafter be made valid only by a new delivery with the intent of defendant and deceased that it should be binding on both.

"5. You are further instructed, if you find from the evidence that said policy was delivered without requiring payment of the first premium and without any intention on the part of said Drewlow of taking and retaining said policy and paying the premiums accruing thereon, but that subsequently it was agreed between said Drewlow and the general manager of said defendant company that Drewlow should retain said policy and should pay to said defendant the amount of the first premium thereon at a later date, then you are instructed that such transaction amounted to a valid delivery of the policy and a giving of credit for the first premium, and said policy took effect and became a binding contract at and from the time such arrangement was made, and for all the purposes of this case it would be immaterial whether such first premium

was ever paid or not; and if you find such arrangement was made and such credit was given, plaintiff will be entitled to recover in this case."

In the brief it was stated: "It will be observed that by these two instructions the court submitted it to the jury to determine whether or not there had been a subsequent delivery of the policy, or whether or not there had been an agreement to waive the payment of the first premium. There was not, in my judgment, a particle of evidence justifying the submission of these questions to the jury." An examination of the evidence has convinced us that there was sufficient in the narration of what occurred between the general manager of the company and Drew-low and Chapman to warrant and to require the sub-mission to the jury of the question of it being then agreed that Drewlow was to keep the policy and pay the pre-mium from commissions earned in soliciting insurance, and that there was not submitted whether there was a "waiver of the payment of the first premium," but whether, as stated by the court, "credit" or time had been given within which it should be paid. It was further argued in this connection that these two paragraphs of the instructions embodied a proposition of fact to be settled by the jury which was not of the issues presented in the pleadings. Of the allegations of the petition was the following:

"3. That on the 16th day of December, 1891, one John W. Drewlow, a resident of Stanton, Stanton county, Ne-braska, entered into a certain written agreement with the defendant Union Life Insurance Company of Omaha, Nebraska, by virtue of which agreement said defendant was, for a consideration to be paid by the said John W. Drewlow to this defendant and in accordance with cer-tain conditions and reservations in said agreement set forth, to pay Helen and Richard Drewlow, his children, or their executors, administrators, or assigns, upon sat-isfactory proof of the death of the said John W. Drew-low, after deducting therefrom all indebtedness due to

the company, the Union Life Insurance Company of Omaha, Nebraska, from said John W. Drewlow the sum of two thousand dollars ($2,000)."

Of this there was a denial in the answer, and, as we have hereinbefore set forth, there were also certain affirmative statements on the subject of the delivery of the policy which were denied in the reply. Under the allegation that the agreement "was for a consideration to be paid by Drewlow," and its denial, the matter of the contract between the manager and Drewlow was fairly within the issues, and where a credit is extended for the payment of a premium, of which payment is required to constitute the policy of force, the policy becomes operative and binding. (*Miller v. Brooklyn Life Ins. Co.*, 12 Wall. [U. S.] 285; *Boehen v. Williamsburgh City Ins. Co.*, 35 N. Y. 131; *McAllister v. New England Mutual Life Ins. Co.*, 101 Mass. 558.)

At request of defendant in error the following instructions were given:

"1. You are instructed that what purports to be a copy of the application printed and written on the back of the policy is not in evidence and should not be considered by you.

"2. You are further instructed that the printed indorsement on the back of the policy, entitled 'notice to the policy holder,' is no part of the policy, is not in evidence and should not be considered by you."

It is asserted that this action was of prejudice to the right of the company, in that there was thereby withdrawn from the consideration of the jury the fact that in the application and on the back of the policy there appeared notice to the party to be insured or a stipulation to the effect that the policy could not and did not become of force until the first premium had been paid during the life and good health of such party, and that there appeared further on the back of the policy, that no agent had authority to collect the first premium unless there was in his possession a receipt for the premium signed by

the president, vice-president, or secretary of the company. Under the issues joined and the evidence adduced, whether the matters to which we have referred entered into the consideration of the jury could not affect their findings or verdict; hence that they were withdrawn by the instructions could not prejudice the rights of plaintiff in error.

No errors were assigned and presented which call for a reversal of the judgment and there must be an affirmance.

AFFIRMED.